# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 5, 2018

Decided April 6, 2018

No. 16-1412

UNITED STATES POSTAL SERVICE,
PETITIONER

v.

POSTAL REGULATORY COMMISSION,
RESPONDENT

On Petition for Review of Orders
of the Postal Regulatory Commission

*David C. Belt*, Attorney, U.S. Postal Service, argued the cause and filed the briefs for petitioner. *Stephan J. Boardman*, Chief Counsel, entered an appearance.

*Dana Kaersvang*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were *Michael S. Raab*, Attorney, *David A. Trissell*, General Counsel, Postal Regulatory Commission, and *Christopher J. Laver*, Deputy General Counsel.

Before: PILLARD, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  The United States Postal Service proposed to discontinue its Return Receipt for Merchandise (RRM) service in 2014.  RRM service offers retail and commercial mailers of merchandise the option to affix to their packages a postcard-style form for the recipient to sign, which the Postal Service then returns to the mailer as confirmation of delivery.  Citing a precipitous eighty-six per cent drop in RRM service usage over the three years from 2011 to 2014, the Postal Service argued that RRM service had become outdated and inefficient in the wake of electronic delivery confirmation capacities.  The Postal Regulatory Commission agreed.  As required by the statute and regulations governing additions to or deletions from the lists of Postal Service products, the Commission considered a range of factors—including price effects and the interests of RRM service users—before it approved the discontinuation.

In the same orders, however, the Commission took the unprecedented step of holding that the discontinuation of a service on the Postal Service's authorized list of market-dominant products also amounted to a rate increase subject to the statutory rate cap.  Despite evidence that former RRM service customers were now more cheaply obtaining electronic signature delivery confirmation, the Commission assumed all remaining RRM customers would continue to insist on physical postcard delivery confirmation which, absent RRM service, would only be available at a higher price, ancillary to Certified Mail service.  By treating the discontinuation of RRM service as a price hike subject to the rate cap, the Commission in effect conditioned dropping RRM on the Postal Service's willingness to "pay" hundreds of thousands of dollars via a rate cap application that would force the Postal Service to lower overall prices on its other ancillary services.

The Postal Service now seeks review of the Commission's orders, arguing that they exceed the Commission's statutory authority and are arbitrary and capricious. We grant the Postal Service's petition for review and hold that the Commission lacks statutory authority to subject the wholesale discontinuation of RRM service to the rate cap applicable to rate increases.

I.

A.

In 2006, Congress enacted the Postal Accountability and Enhancement Act (Act), Pub. L. 109-435, 120 Stat. 3198, to reform U.S. postal laws. In the decades leading up to the Act's passage, Congress had authorized the Postal Service to set its own postage rates, "with the goal of breaking even." *See United States Postal Service v. Postal Regulatory Commission*, 785 F.3d 740, 744 (D.C. Cir. 2015) (*USPS I*). Critics objected that, because the Postal Service exercised market power allowing it to pass on increased costs to consumers, it lacked incentives to improve its efficiency. *See id.* Congress responded with legislation encouraging the Postal Service to reduce costs, increase efficiency, achieve stability in rates, and empowering the Service to act with flexibility to experiment with ways to improve its appeal to customers. 39 U.S.C. § 3622(b)(1)-(9); *see also* S. Rep. No. 108-318, at 1 (2004). The Act also "guarantees a higher degree of transparency to ensure fair treatment of customers of the Postal Service's and those companies competing with the Postal Service's competitive products." S. Rep. No. 108-318, at 1.

The parties here invoke two principal sections of the Act: One, Section 3642, governs the Commission's pre-approval, based on a balancing of several criteria, of changes to the composition of "the lists" of competitive and market-dominant

products the Postal Service offers. 39 U.S.C. § 3642(a). The Postal Service's competitive products vie with similar products on the open market, while the Postal Service exercises substantial market power or enjoys a legal monopoly over its market-dominant products. *Id.* The other provision in play, Section 3622, calls on the Commission to enforce a cap on "changes in rates" of market-dominant products and services to ensure that average increases in prices of the group of products within a given classification do not exceed the rate of inflation. *Id.* § 3622(d)(1)(A). As the Postal Service understands it, the Act confines the Commission's review of product discontinuations to what Section 3642 commands when the Postal Service "change[s] the list[s]" of products. The Commission, for its part, asserts authority to conduct twofold review of a product discontinuation: It argues that some changes to the product lists are also tantamount to rate increases, at least to the extent that discontinuation of a product might funnel customers to a more costly alternative—a form of abuse the Commission asserts Congress authorized it to control by subjecting such product discontinuations to review under both Section 3642 and 3622.

1. Section 3642 of the Act charges the Postal Regulatory Commission with maintaining and publishing accurate product lists in the Mail Classification Schedule, and authorizes the Commission to "change the list[s]" of market-dominant and competitive products by adding, removing, or transferring products. *Id.* § 3642(a). Congress fashioned the initial lists of available market-dominant and competitive products in the Act. *See* 39 U.S.C. §§ 3621, 3631. First-class letter mailing, for example, was characterized as a market-dominant product, while bulk parcel post was deemed competitive. *Compare id.* § 3621(a)(1), *with id.* § 3621(a)(3). In addition to letter mailing and parcel delivery, the Postal Service offers a host of ancillary services, including mechanisms for commercial and retail

customers to track and verify the receipt of their missives. Ancillary services such as RRM fit within the class of "Special Services" on the Postal Service's list of market-dominant products. *See* Postal Regulatory Comm'n, Mail Classification Schedule Pt. A, §§ 1500, 1505.14 (2018).

As it set the initial product lists, Congress also recognized that both supply and demand for a given product would not remain constant in a "rapidly" changing market. *See* S. Rep. No. 108-318, at 18. The Commission may add, remove, or transfer a listed product "[u]pon request of the Postal Service or users of the mails, or upon its own initiative." 39 U.S.C. § 3642(a). The Act invests the Postal Service with substantial flexibility to manage and innovate with its products, subject to holistic review of additions to or deletions from its lists. *See Id.* §§ 403(b), 3642; *see also* S. Rep. No. 108-13, at 18 ("The goal of increased flexibility and increased responsiveness to customers' needs requires that the Postal Service manage its product offerings."). Whenever the Postal Service seeks permission to change the menu of market-dominant products, it must publish a new list in the Federal Register that "indicate[s] how and when any previous lists . . . are superseded." 39 U.S.C. § 3642(d)(2).

In determining whether to add, remove, or transfer a listed product, the Commission must consider its availability in the private sector, the "views of those who use the product," and the likely impact of the change on small businesses. *Id.* § 3642(b)(3). Those factors are capacious, and, as the Commission recognizes, require "careful consideration," time, and often additional information to evaluate. *See* Order No. 3670, Order on Price Adjustments for Special Services Products and Related Mail Classification Changes (Dec. 15, 2016), at 10-11. Regulations implementing Section 3642's list-amending authority provide that "the product lists and the Mail

Classification Schedule may be modified subject to the procedures specified in this part." 39 C.F.R. § 3020.1. Those procedures include specific requirements of information the Postal Service must provide to the Commission in support of its requested changes, *id*. at §§ 3020.31-3020.32, and call on the Commission to post any proposed change for public comment, *id*. at § 3020.33; *see id*. § 3020.53. The Commission then must scrutinize proposed changes, together with any comments, to ensure that, among other things, the product's suggested list location (competitive or market-dominant), quality, desirability to the public, effect on small business, and its pricing comport with the Act's overall objectives of enhancing the efficiency and competitiveness of the Postal Service and preventing abuse of its market power. *Id*. at § 3020.32. In sum, in its Section 3642 review of changes to the menu of products the Postal Service offers, the Commission has broad authority to act in the public interest and to prevent the Postal Service from abusing its unique and powerful market position.

2. With respect to market-dominant products, Congress separately charged the Commission with overseeing and limiting the Postal Service's annual price increases. 39 U.S.C. § 3622. Any price change for a market-dominant product requires the Commission's approval, which can be granted subject to the "rate cap," that is, an "annual limitation on the percentage changes in rates" tied to the rate of inflation. *Id.* § 3622(d)(1)(A), (C); *see USPS I*, 785 F.3d at 744-45; *United States Postal Service v. Postal Regulatory Comm'n*, No. 16-1284, slip op. at 4-5 (D.C. Cir. Apr. 6, 2018) (*USPS II*). As we have recently explained, applying the rate cap entails two analytically distinct steps:

*First*, the Commission must determine whether the Postal Service's proposed change even amounts to a covered change

in rates.  Under the Commission's current interpretation of the Act, once revised in response to *USPS I*, a "change in rates" may include a change "either to the posted rates," or, as the Commission contends occurred here, an indirect, *de facto* change to "the rates that customers actually pay."  *USPS I*, 785 F.3d at 751.  Only a "change in rates" is subject to the rate cap. We have, however, held that the reference to "rates" in Section 3622 is sufficiently ambiguous to include, for example, new, non-price mailing requirements that effectively force existing mail into a higher price category, or "rate cell."  *Id.* at 751-52. For purposes of applying the rate cap, "[t]he term rate cell means each and every separate rate identified in any applicable notice of rate adjustment for rates of general applicability."  39 C.F.R. § 3010.23(a)(2).    More recently, we reminded the Commission that it can regulate changes to mail-preparation requirements under the guise of the price cap only if it has reasonably "single[d] out" those changes "that induce mailers to shift to a higher-priced service."  *USPS II*, slip op. at 10-11.

*Second*, if the Commission determines that there has indeed been a proposed change in the rate of a market-dominant product, the Commission applies formulas laid out in the Commission's regulations to determine whether the extent of the change is permissible under the rate cap.  *See* 39 C.F.R. § 3010.23(c)-(d); *see also USPS II*, slip op. at 13.   The Commission mechanically uses so-called "historical volume" data—the number of mailers using the product last year—to calculate the weighting of the rate change to be charged against the rate cap for the current year.  39 C.F.R. § 3010.23(d). Simplifying the calculation for our purposes, the Commission multiplies that assumed static number of mailers by the increase or decrease in the price of the product.  *Id.* § 3010.23(c)-(d).  In other words, the Commission posits that the same mail will be sent in the current year as in the prior year, but at the higher or lower price.  After making that

calculation for each product in a "class" of products, the Commission applies the rate cap to the sum of the weighted average price changes of all the products in the class. *See id; USPS II*, slip op. at 4-5.

## B.

Before the Postal Service proposed to discontinue RRM service, merchandise mailers had several delivery-confirmation service options, the most pertinent of which are listed below, accompanied by their December 2014 prices:

- Signature Confirmation ($2.25), providing the mailer an electronic copy of the recipient's signature online or by email, in addition to online access to tracking information, *see* Postal Regulatory Comm'n, Mail Classification Schedule § 1505.17; and
- Return Receipt for Merchandise (RRM) ($4.20), mailing to the merchandise mailer a physical postcard bearing the recipient's signature, *see id.* § 1505.14.

Joint Appendix (J.A.) 153. Postcard delivery confirmation also was available for an extra charge by combining Certified Mail service with a Return Receipt add-on service. Certified Mail service—comprised of proof of mailing, electronic tracking, delivery confirmation, and various recordkeeping—is available for a baseline price of $3.15, J.A. 149, and the Postal Service offers Certified Mail customers the option to get the recipient's signature confirming delivery electronically for an extra $1.30 or on a physical postcard for an extra $2.60. Postal Regulatory Comm'n, Mail Classification Schedule § 1505.5; J.A. 153.

The Postal Service in 2014 sought to discontinue RRM service as outmoded. *See* Request of the United States Postal Service to Remove Return Receipt for Merchandise Service

from the Mail Classification Schedule (Nov. 17, 2014) (RRM Discontinuation Request). RRM service lacked tracking capacity and its package-receipt information was not electronically accessible, leading many customers to abandon it in favor of electronic signature confirmation. *See id.* Attachment B at 2, 5 n.11. Between 2011 and 2014, purchases of RRM service fell from more than 1.2 million to less than 170,000, or more than eighty-six per cent. *See id.* Attachment B at 2. The Postal Service proposed to streamline its list of offerings by discontinuing the service. *Id.*

After soliciting public comment, the Commission in Order No. 2322 approved the Postal Service's request to discontinue RRM service. *See* Order No. 2322, Order Conditionally Approving Removal of Return Receipt for Merchandise Service from Mail Classification Schedule (Jan. 15, 2015) (Order No. 2322). The sole customer comment, submitted by someone who did not claim to be a commercial or retail mailer eligible for RRM service, objected that mailers might have a "legal need" for a non-electronic signature or lack the ability to receive an electronic version and, if RRM service were discontinued, need to use Priority Mail rather than Standard Post at an increased price in order to be eligible for the Certified Mail option through which the customer could then opt to pay extra for the postcard return receipt. J.A. 163. The Public Representative was the other commenter, and she similarly noted that the discontinuation of RRM service would disserve those businesses that "do not have broadband access or . . . prefer to have a physical return receipt postcard in their records." J.A. 167. She faulted the Postal Service for failing to "quantify the number of customers that may be left with no alternative for obtaining a physical return receipt"—customers who might resort to the costlier classes of mail eligible, at yet further cost, for Certified Mail and Return Receipt services. *Id.*

The Commission's Order No. 2322 held that discontinuing RRM satisfied the statutory criteria under 39 U.S.C. § 3642(b) and the regulatory requirements of 39 C.F.R. §§ 3020.30 *et seq.* for removing a service from the Mail Classification Schedule. *See* Order No. 2322, at 12-14. The Commission determined that, if RRM service were discontinued, "similar services" would still be available from private-sector shippers such as United Parcel Service and Federal Express, as well as from the Postal Service itself. *Id.* at 12. Given that availability, and the lack of any complaints from the vast number of former RRM users who had migrated to electronic signature confirmation, the Commission did not believe that customers would oppose the discontinuation of RRM service. *Id.* Considering small business concerns in particular, as the statute requires, the Commission likewise lacked any negative feedback from them about the proposal, and found any material effect unlikely. *Id.* at 13. Regarding potential price implications for any customers who might still require physical return receipt postcards, the Commission found "that the Postal Service's decision to remove a service with declining volumes and revenue outweighs the potential harm that current customers may face." *Id.*

The Commission had never before applied the Section 3622 rate cap as a condition of Section 3642 product-discontinuation review, but in this case it went on to treat the proposed discontinuation of RRM service as a proposal to change the rate for a market-dominant product within the meaning of Section 3622(d), thereby subject to the statutory rate cap. *Id.* at 6-15. The Postal Service contended that the proposal "is not changing the rates of RRM service . . . but instead is removing the service altogether." *Id.* at 5. But the Commission focused on the resultant "deletion" of a "rate cell" to hold that discontinuation of a product also necessarily deletes a rate cell and so, it reasoned, is a change in rates to

which the rate cap applies. *Id.* at 9; Order Resolving Issues on Remand, at 3 (Oct. 31, 2016) (Order No. 3597).

In so doing, the Commission imported its analysis from Order No. 1890—an Order which, in its various iterations, we have now twice had occasion to review and twice deemed invalid. *See USPS I*, 785 F.3d at 753-56; *USPS II*, slip op. at 8-14. In *USPS I*, we reviewed Order No. 1890. 785 F.3d at 751. That order concerned a change to the mail-preparation requirements for certain bulk mail to qualify for automation discounts. The Postal Service offers discounts to mailers who put certain barcodes on their mail before sending it, with higher discounts offered for more information-rich barcodes. When the Postal Service proposed to eliminate the discount for relatively simple barcoding—deleting that "rate cell," with its particular requirements and corresponding price—the Commission noted that mailers might not change their mail preparation to adopt the more sophisticated barcodes that would entitle them to an even steeper discount than the eliminated one. The Commission thought elimination of the discount associated with the simpler barcode should thus be treated as "shifting mailpieces to higher rates" charged for non-barcoded mailpieces. *See id.* We held that the statute's references to "rates" and "changes in rates" were sufficiently ambiguous to potentially encompass some mail-preparation changes with rate effects, but that treating cessation of the discount for the simpler barcode as a "change in rates" was arbitrary and capricious. *Id.* at 751-56. The agency had failed to "articulate a comprehensible standard" for determining the circumstances in which such a change to mail preparation requirements would trigger the rate cap. *Id.* at 753-56.

On remand from *USPS I*, the Commission sought to clarify its standard by adding that, when a change to mail preparation requirements results in the "deletion of a rate cell" and/or the

"redefinition of a rate cell," the mail preparation change amounts to a rate change subject to the rate cap. Order No. 3047, Order Resolving Issues on Remand, at 15 (Jan. 22, 2016).

Meanwhile, after this court in *USPS I* remanded the Commission's implicit-rate-change test as arbitrary and capricious, the Postal Service and Commission agreed that the Commission should reconsider its RRM service Order No. 2322. In Order No. 3597, it affirmed Order No. 2322, reiterating that the discontinuation of RRM service was a change in price because it "constitute[s] the deletion of a rate cell." Order No. 3597, at 3. Applying the rate cap to that putative rate change, the Commission identified Certified Mail with Return Receipt as a "suitable alternative" to RRM service—and, indeed, the only alternative, with the "key characteristic" being "the physical mailing of a receipt postcard." *Id.* at 4-5. The Commission thus required the Postal Service to account within the rate cap for all of the prior year's RRM service customers as a "mail volume shift from RRM Service to Certified Mail (with Return Receipt)," multiplied by the full price difference between the discontinued RRM service and Certified Mail with Return Receipt. *Id.* at 5.

In view of the Commission's ruling that the price cap applies, the Postal Service indefinitely deferred discontinuation of RRM service pending resolution of the current petition.

The Postal Service petitioned for review a second time in the barcodes case, and also filed the petition regarding RRM service now under review. In the barcodes case, the Postal Service argued that the Commission had still failed to clarify how, consistent with the statutory definition of "rates" and "changes in rates," the Commission could subject the barcode change to the rate cap. We vacated Order No. 3047 because

the Commission failed to establish that its new test was confined to those changes to mail preparation requirements that have rate effects; the test therefore impermissibly "expand[ed] the Commission's regulatory domain beyond any permissible meaning of 'rates' under § 102(7) and 'changes in rates' under § 3622." *USPS II*, slip op. at 8.

We consider here the Postal Service's challenge to the Commission's orders holding that the Postal Service may discontinue RRM service only if it counts the discontinuation as a price increase within the statutory rate cap. Those orders, says the Postal Service, exceed the Commission's statutory authority under *Chevron*, and are arbitrary and capricious.

## II.

## A.

We begin with the statute, and ask whether Congress authorized the Commission to treat the discontinuation of a product under 39 U.S.C. § 3642 as also a change in "rates," as defined by 39 U.S.C. § 102(7), that is subject to the statutory rate cap imposed by 39 U.S.C. § 3622. The Postal Service contends that the statute expressly sets forth in Section 3642 the criteria by which the Commission may review a decision to change the lists of postal products, and that also subjecting a product list amendment to Section 3622's rate cap contradicts the statute's terms and logic. The Commission counters that it may review a product discontinuation both under Section 3642, to determine whether the Postal Service may cease offering a product, and under Section 3622 for rate cap compliance. Our review of this statutory dispute is governed by *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984), under which we first ask whether Congress has "directly spoken to the precise question at issue." *Id*. at 842. If it has, "that is the end of the matter; for the court, as well as

the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43; *see also USPS I*, 785 F.3d at 750. We conclude that the Act directs the Commission to review product discontinuation requests under the regime articulated in Section 3642, and that the Commission's authority to limit changes in rates under the rate cap does not reach changes to product availability.

The Act empowers the Commission to conduct different review processes for two distinct types of changes: (1) review under Section 3642 of additions to, deletions from, or shifts between the lists of competitive and market-dominant products the Postal Service offers; and (2) review under Section 3622 of increases to Postal Service rates for products continuing from year to year on the market-dominant list. Each form of review is geared to the distinct degree of latitude the Act envisions for the Postal Service regarding the open-ended universe of potential product offerings and the closely capped prices to be charged for them. Congress designed the Act to encourage the Postal Service's flexibility and experimentation, urging the Postal Service to generate products of greater public appeal while streamlining its offerings to make them easy for customers to access and understand. 39 U.S.C. §§ 403(b), 3622(b), 3642; *see also* S. Rep. No. 108-13, at 18. Congress gave the Commission authority to review and approve such proposals, *see* 39 U.S.C. § 3642(a), but Congress did "not intend for [that authority] to result in Postal Regulatory Commission management of the Postal Service's product offerings," S. Rep. No. 108-318, at 18. Meanwhile, to guard the public from abuse of the Postal Service's partial monopoly, Congress provided that the rate of increases in prices for the segment of products over which the Postal Service exercises market power are to be closely reined in by the Commission's calculation and enforcement of an inflation-adjustable rate cap. 39 U.S.C. § 3622(d).

We conclude Congress provided review under Section 3642 as a sufficient and complete mechanism for the Commission's consideration whether the lists of available postal products should be changed. Section 3642 lays out the process and substantive considerations for managing the lists. It requires a broad, contextual consideration of the very market-power concerns that the Commission claims support its application of Section 3622's inflation-based limit on rate changes. In particular, for determinations whether to approve a Postal Service proposal to discontinue or add a product, Congress directed the Commission to scrutinize the availability of the product in the private sector, the views of those who use the product, and the likely impact on small businesses. *Id.* § 3642(b)(3)(A)-(C). Before accepting the Postal Service's proposal at issue here to discontinue RRM service, the Commission considered evidence that mailers could obtain similar service through private shipping companies. It concluded that small businesses would not be inconvenienced by the change. It studied and credited the Postal Service's evidence and arguments that the Postal Service would be able to offer "improved features" to its customers if allowed to discontinue the RRM service. *See* Order No. 2322, at 12-13.

Commission review under Section 3642 assimilates the concerns about abuse of monopoly power that the Commission contends justified its resort to Section 3622. Review under Section 3642 ensures that no product is discontinued unless doing so furthers the efficiency and innovation goals of the Act, and requires the Commission to consider availability in the private sector and any impact on mailers and small businesses. The parties acknowledged that a change like the one at issue here, discontinuing a product that a rapidly dwindling number of customers want, might still cause some residual number of customers to resort to a higher priced alternative. The Commission scrutinized the record the Postal Service had

developed on that issue in its consideration of the Section 3642 factors. The anticipation that some RRM customers would resort to Certified Mail with Return Receipt (postcard option) was, the Postal Service submitted, a very limited and acceptable potential downside in this case, outweighed by the streamlining and efficiency benefits of RRM discontinuation. The Commission agreed, specifically concluding that the "declining volume and revenue" from the RRM service "outweighs" any "potential harm" current customers might face, including the acknowledged possibility that some might then choose a higher-priced delivery confirmation service. Order No. 2322, at 13-15. If the Postal Service had, instead, proposed a product list change that would have materially harmed mailers or small businesses by, for example, abusing the Postal Service's market power through camouflaging a monopolistic rate increase as a product addition or deletion, the Commission would have been fully empowered—indeed, required—under Section 3642 to reject that proposal. That is, review under Section 3642 adequately and appropriately addresses whether a proposed product change would abuse the Postal Service's market power.

The Commission nonetheless contends that, on top of the Section 3642 process, product discontinuation should also be subject to the Section 3622 review process for changes to prices of retained products. Ceasing RRM service "deletes" the rate cell for that service, the Commission asserts, thereby changing RRM service's effective rate to the higher rate charged for Certified Mail with Return Receipt. That argument collapses important distinctions in the statutory scheme. Both formally and conceptually, the Act treats a Postal Service proposal to change its lists of products distinctly from how it treats a Postal Service request to change the prices at which its products are offered from year to year. *Compare* 39 U.S.C. § 3642, *with id.* § 3622.

The text of the Act reflects the distinction Congress made. The object of Section 3622 is explicit: It applies only to changes in "rates," which the Act defines as "fees for postal services." 39 U.S.C. § 102(7). The object of Section 3642— "postal service[s]"—in turn, is quite broad and varied, defined as "delivery of letters, printed matter, or mailable packages, including . . . functions ancillary thereto." *Id.* § 102(5). The distinction between "rates" and "postal services" is central to the text and regulatory logic of the Act. In reading its own authority to closely control changes in "rates," *i.e.* "fees for postal services," to apply to changes in the Postal Service's chosen menu of "postal services" themselves, the Commission elides a key distinction in the statute.

By preventing the Postal Service from raising product prices faster than the rate of inflation, the rate cap of Section 3622, like the Section 3642 analysis, prevents the Postal Service from "improperly leverag[ing] its monopoly powers over" market-dominant products. *USPS I*, 785 F.3d at 744. But Section 3622 operates in a more mathematical and focused way than Section 3642. Section 3622's formulaic approach is appropriate to calculation of permissible incremental changes to rates for continuing products. It is inapposite to the question whether the Postal Service may lawfully discontinue an outdated product or offer a new one.

The relatively lean and expedited character of the process by which the Commission reviews compliance with the rate cap, in contrast to the Commission's broader and more extended review of changes to the menu of offerings, further confirms each process's distinct role. Section 3622 limits only the magnitude by which the Postal Service can raise or lower prices each year. 39 U.S.C. § 3622(d); *USPS II*, slip op. at 4. It operates by formula to control how steeply the Postal Service may raise rates for those products it continuously offers: It

limits "annual" rate changes, envisioning "regular" increases that do not abuse the Postal Service's market dominance, and that meet the public's need for "predict[ability]." S. Rep. No. 108-318, at 42 (2004). As the Commission itself has explained, "[t]he limited focus of [rate-cap] review allows the Commission to typically resolve these cases on an accelerated 45-day schedule." Order 3670, at 10. By contrast, "significant classification changes, such as a Postal Service proposal to remove a product . . . , exceed the scope of [a rate change] proceeding because they require more careful consideration than an expedited price adjustment review can provide." *Id.* The Postal Service here requested to discontinue the RRM service; the multi-faceted review Section 3642 requires of changes to the list of market-dominant products, with prominent consideration of customers' interests and the Act's goals of innovation and efficiency, is the process Congress designed for the Commission's review of such a request.

The Commission's own subsequent actions lend support to our statutory reading. The Commission had never before subjected product discontinuation to the rate cap and, even after doing so in this case, the Commission went on to clarify in a different case that a service discontinuation proposal did not belong on the expedited "annual rate docket." *Id.* Among a group of proposed changes to both services and rates, the Postal Service had proposed to discontinue the Collect on Delivery service, in which mailers can send articles at no cost by having the Postal Service collect payment for both the article and shipping cost from the addressee at the point of delivery. *Id.* at 9. The Postal Service would replace that discontinued service with one called Collect on Delivery Hold for Pickup, in which the addressee picks up and pays for the parcel at a Post Office. *Id.* The Commission there correctly recognized that, as "a proposal to remove a product . . . or to make a material change" to a product definition, the matter "require[d] more careful

consideration than an expedited price adjustment review [under Section 3622] can provide." *Id*. at 10. The Commission then required the Postal Service to raise the proposal as a product discontinuation matter in a proceeding for review under Section 3642. *Id.* at 11.

The Commission raises one more defense of its statutory authority. It notes that a Commission rule says the Postal Service must explain why any change to the list of market-dominant products is "not inconsistent with" Section 3622(d), which includes the statutory rate cap. *See* 39 C.F.R. § 3020.32(b). According to the Commission, that regulatory cross-reference means that discontinued products are subject to the rate cap. Alternatively, however, that regulation confirms that the Commission has an opportunity to consider prices as part of its product-offerings analysis under Section 3642, obviating the need for a formal Section 3622 inquiry on top of Section 3642 review. In any event, the Commission cannot use its own regulations to expand its statutory authority. Again, "[t]he Commission's reliance on its regulation plainly cannot justify its giving the statutory 'changes in rates' a meaning outside the range of genuine ambiguity." *USPS II*, slip op. at 12.

By applying the rate cap to the proposed discontinuation of RRM service, the Commission undermines the congressional design wherein the Postal Service bears primary responsibility and has substantial flexibility to manage its lists of offerings. Grafting Section 3622 review to the back of the requisite Section 3642 process places a major and unwarranted obstacle in the way of the Postal Service's prerogative. The orders under review made the proposed innovation impracticable, effectively freezing the Postal Service's portfolio of product offerings—a result plainly not contemplated by the Act.

B.

The statutory flaw in the Commission's analysis is underscored by the Commission's awkward and unsuccessful efforts to implement its novel approach. The Commission has "fail[ed] to articulate a comprehensible standard" for the circumstances in which it believes an amendment to a Postal Service product list triggers the rate cap. *USPS I*, 785 F.3d at 753.

The Commission first attempts to liken discontinuation of a product to deletion of a rate cell, which it then claims authority to treat as a change in rate under its barcode orders, Nos. 1890 and 3047. *See* Order 2322, at 9. One evident problem with that argument is that we have rejected the notion that "deletion of a rate cell" meaningfully equates to a rate change. *See USPS II*, slip op. at 11. Even had we accepted that argument in the context of preparation requirements for barcoded bulk mail, however, there are further difficulties here.

While the Commission casually assumes that mailers who purchased the RRM service in the past did so in order to obtain a postcard receipt, it offers no evidentiary basis or rational supporting account. The Commission has not explained why Certified Mail (with Return Receipt), rather than Signature Confirmation, is the choice mailers would make. In fact, the great majority of mailers who previously purchased the RRM service have in recent years switched to the electronic Signature Confirmation option. The Commission's prediction is not only unexplained—the precipitous decline in RRM use suggests it is also wrong. *See* RRM Discontinuation Request, Attachment B. at 2; Pet'r's Br. at 10-11. *Cf. USPS II*, slip op. at 10.

The Commission's own regulations also expressly belie its contention that all rate cell deletions automatically have rate

effects. Even were we to assume that deletion of a rate cell identified a "change in rates" that, at least as a formal matter, must be reviewed for rate cap implications, the mere call for such review does not mean that any rate cap effect will be found. Under the Commission's own regulations, deletion of a rate cell might simply call for zeroing out that cell. *See* 39 C.F.R. § 3010.23(d)(4); *see also* Order No. 3670, at 11 n.25. Which treatment applies depends on where the Commission counts the volume of product usage that it previously counted in the deleted cell, which depends on whether an "alternate rate cell" is available. If it is, the volume from the deleted rate cell in the prior year is ordinarily applied to the "alternate rate cell" in the current year at the new price. 39 C.F.R. § 3010.23(d)(3). But where an alternate rate cell "is not available, the Postal Service should adjust the billing determinants associated with the rate cell to zero," 39 C.F.R. § 3010.23(d)(4), in other words, zero out both the volume and price of the product associated with the deleted cell and neither debit nor credit it against the Postal Service's rate cap in the following year. *See* Order No. 2322, at 9-10. Pointing out that a rate cell is "deleted" merely raises the question whether an alternate rate cell is available— and what that alternate would be.

The Commission makes little effort to define the concept of an "alternate rate cell." In the challenged order, it explained only:

> Certified Mail (with Return Receipt) is the only alternative option with 'basic characteristics' that closely mirror RRM Service's basic characteristics. This makes it the only reasonable substitute. Specifically, the key characteristic of RRM Service is the physical mailing of a receipt postcard . . . . Should the removal of RRM Service occur, customers seeking that basic characteristic would need to

purchase Certified Mail (with Return Receipt), paying higher rates to receive a physical mailing of a receipt postcard than they currently pay for RRM Service.

*Id.* at 9. That conclusory analysis is inadequate.

In selecting Certified Mail with Return Receipt (postcard) as the "alternate rate cell" providing equivalent service to RRM, the Commission assumes that a physical postcard is the key characteristic of the RRM service without explaining why. It asserts that mailers will pay a higher rate for a physical postcard (among a cluster of other services provided by Certified Mail) in the wake of RRM service's discontinuation. That position lacks practical and economic logic. Consider an illustrative analogy: Were a restaurant to eliminate French fries from the list of side orders available on its dinner menu but still serve them as part of a "steak frites" entrée, we would not ordinarily describe the restaurant as having raised its price for an order of French fries but, more naturally, that it discontinued that option. Needless to say, not everyone who used to order fries could fairly be expected to switch to the steak frites entrée. Likewise, the availability of postcard confirmation through Certified Mail does not mean the alternative to RRM service is Certified Mail with postcard Return Receipt. The two services share a common feature, but that feature does not make Certified Mail with Return Receipt the higher priced "alternate" to RRM service. The Commission's difficulties in identifying the new rate for discontinued RRM service further confirm that the Commission's untenable position conflicts with the statutory design.

\* \* \*

For the first time, the Commission in the orders under review proposed to treat discontinuation of a product under

Section 3642 as a rate change subject to Section 3622's rate cap for market-dominant products. The Commission lacks statutory authority to conduct such overlapping review, subjecting discontinuation of a product to multi-factored review under Section 3642 and simultaneously treating it as a rate change under Section 3622. We accordingly grant the petition for review and vacate Orders No. 2322 and 3597.

*So Ordered.*